## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | ) |
| | ) Chapter 11 |
| PLYMOUTH OIL COMPANY, LLC, | ) |
| | ) Bankruptcy No. 12-01403 |
| Debtor. | ) |

### MEMORANDUM AND ORDER

This matter is before the Court on several pending Motions.   The most important matters before the Court are Plan Confirmation and a Motion to Lift Stay by a group of creditors.   The Court held the Plan Confirmation hearing in Sioux City, Iowa on May 29, 2013.   Brad Kruse appeared for Debtor.   Randy Wright appeared for Ryan Lake, Steven Vande Brake, Arlon Sandbulte, Iowa Corn Opportunities, LLC, and Dirk Dorn (collectively referred to as "the Bridge Lenders").   Dan Childers appeared for Iowa Prairie Bank.   Brant Leonard appeared for Iowa Corn Processors.   Julie Johnson McLean appeared for FWS Industrial Projects USA.   A. Frank Baron appeared for the Unsecured Creditors' Committee.   John Schmillen appeared on behalf of the United States Trustee's Office.   After post-hearing briefing, and a wave of additional motions, including a Motion to Enjoin Bridge Lenders from attempting to collect on personal guarantees and a Motion to Abstain from deciding these matters filed by Bridge Lenders, the Court held a hearing on July 9, 2013.   The Court provided a tentative ruling denying

confirmation on the basis that the Plan was not feasible based on speculation instead of a reasonably probable basis for reorganization.   Soon after that tentative ruling, the parties asked the Court to defer final ruling on Plan Confirmation while they attempted a global resolution.

After more than a month of negotiations on the global resolution, the Bridge Lenders filed a new Motion for Relief from Stay citing a downward spiral of Debtor's operation that resulted in the plant closing.   The Court held an evidentiary hearing on the Motion for Relief from Stay on September 17, 2013 in Cedar Rapids, Iowa.   Randy Wright appeared for the Movant, Bridge Lenders.   Brad Kruse appeared for Debtor.   Amy Hein appeared for Iowa Prairie Bank.   John Schmillen appeared for the United States Trustee's Office.   Brant Leonard appeared telephonically for Iowa Corn Processors, and A. Frank Baron appeared telephonically for the Unsecured Creditors' Committee.   The Court took the matter under advisement and provided Debtor with an opportunity to file whatever additional documents and/or motions it saw fit.   Nothing has been filed to date. These are core proceedings under 28 U.S.C. § 157(b)(2)(G) and (L).

## FINDINGS OF FACT AND PROCEDURAL BACKGROUND

Debtor filed for Chapter 11 Bankruptcy on July 23, 2012.   At the time of filing, Debtor operated a corn oil extraction plant near Merrill, Iowa, adjacent to an

ethanol refining plant known as Plymouth Energy.   Debtor stated that it produced edible corn oil, defatted corn germ meal, and food grade corn flour.   Debtor also noted that it operated an adjacent feed mill that produced livestock feed.   Debtor's primary product, at the time of filing, was a high protein corn germ meal used for livestock feed.   Debtor also produced a significant quantity of corn oil.   Debtor noted that from its inception it has been in the patent pending process to develop a unique food-grade corn flour.   That corn flour has been referred to as "Golden Essence Flour" for the remainder of the case.   Debtor has asserted there is a large potential consumer market for Golden Essence Flour as a high protein, low cost alternative to gluten-free flour and cooking products.

To get the plant built and begin business operations, Debtor obtained what was intended to be short-term financing from the Bridge Lenders.   The Bridge Lenders originally signed separate promissory notes dated April 29, 2009 totaling $7,500,000.   At the time of filing, Debtor noted that the balance of the Bridge Lenders' notes was $8,297,046.   The Bridge Lenders were on Plymouth Oil's Board of Directors.   Their notes were secured by first mortgages on the plant and a mortgage on the feed mill, which appears to be second to the mortgage of Iowa Prairie Bank.   The Bridge Lenders also had what amounted to a blanket security interest in Debtor's cash, accounts receivable, inventory, accounts, and general

intangibles.   Iowa Prairie Bank provided Debtor with a term loan and line of credit secured by the feed mill mortgage, referred to above, and on some agricultural land near the plant.   Iowa Prairie Bank had a balance of $651,000 on its term loan at the time of filing and a balance on its line of credit exceeding $250,000.   Altogether, Iowa Prairie Bank's claim, now with interest and penalties, is well over $1,000,000.

Debtor also had a loan from Iowa Corn Processors.   The loan is secured by a second security interest in the cash collateral.   At the time of filing, the balance of the Iowa Corn Processors note was $486,397.81.

Debtor also borrowed money from FWS Industrial Projects USA, Inc.   At the time of filing, Debtor owed FWS $250,000.   FWS has a security interest in both the feed mill and the cash collateral, but its security interest appears to be subordinate to the others noted above.

Debtors noted throughout the case that it built the plant and started operations based in large part on its belief that it would be able to purchase corn germ—the key product for its operation—from the Plymouth Energy Ethanol Plant in operation on the adjoining property.   Debtor alleges that Plymouth Energy had promised to or made representations that it would install corn fractionation technology on site. The corn fractionation technology is necessary to get the corn germ that Debtor intended to purchase.   Plymouth Energy never installed the corn fractionation

4

technology, and Debtor has been unable to purchase corn meal and/or other inputs from Plymouth Energy.   Debtor has been required to purchase the corn meal from sites far from its operating plant.   Debtor alleges that this has made the corn germ it has purchased much more expensive than it ever anticipated.   Debtor has filed an adversary in this case against Plymouth Energy.

Immediately after filing bankrtupcy, Debtor made an Emergency Motion for Use of Cash Collateral.   The Bridge Lenders immediately filed a resistance arguing Debtor's operation was not viable and its continued operation would simply dissipate the Bridge Lender's cash collateral without any realistic hope of reorganization.   The Court issued an emergency, temporary order allowing use of cash collateral and set the matter on for a final hearing on September 11, 2012.   On September 13, 2012, the Court entered a Cash Collateral Order granting Debtor's use of cash collateral on terms setting out appropriate adequate protection for the Bridge Lenders.   The Cash Collateral Order was to expire in early November, 2012.

As the time approached for expiration of the First Cash Collateral Order, Debtor filed a Second Motion for Use of Cash Collateral.   The Motion was set for hearing in Cedar Rapids, Iowa on November 14, 2012.   For various reasons, the hearing was continued to November 28, 2012 in Sioux City, Iowa.   The Court entered a short-term extension of the First Cash Collateral Order.

At the beginning of the November 28, 2012 hearing, counsel for Debtor noted a new development in the case.   He noted there would be a significant infusion $300,000 in of equity by an undisclosed investor and money would be contributed by a Plymouth Oil Board Member individually, David Hoffman.   Largely on the basis of these representations and after the parties had substantial off-the-record discussions, the Court noted its intent to approve a cash collateral order on similar terms to the one previously approved, assuming the addition of the new equity Debtors had obtained.   The Court entered the new Second Cash Collateral Order on December 3, 2012.

On December 11, 2012, the Bridge Lenders filed the December 3 Motion to Vacate the Cash Collateral Order entered.   The Bridge Lenders noted that the $300,000 investment that was promised had not been made.   Only $100,000 of the investment had actually come through.   The Court set the matter for December 20, 2012 but continued the hearing to January 4, 2013 in Cedar Rapids at the request of the parties.

At the hearing on January 4, 2013, the Bridge Lenders pointed out Debtor's failure to come up with the $300,000 it had promised.   The Bridge Lenders also reasserted that they continued to lose money and presented substantial additional testimony that Debtor's cash reserves were being depleted with no prospect of

6

reversing that cycle.    The Bridge Lenders again pointed out that it was functionally their collateral Debtor was using to attempt to reorganize.    The Bridge Lenders noted that they should not bear all the risk while Debtor continued with what the Bridge Lenders believed to be an ill-conceived attempt to reorganize.

Debtor put on testimony that it still hoped the additional money would come in to get to the $300,000 level.    Debtor noted it was in an unforeseen surprise that the money did not come in as anticipated.    Debtor also attempted to show that it was not losing cash, but was in fact maintaining, if not increasing, the cash on hand and protecting the Bridge Lenders' interest.    Debtor, like the Bridge Lenders, reiterated its arguments from the first cash collateral hearing.    Debtor continued to point out that the plant itself was worth $8,000,000 based on the appraisal it had provided at the first hearing.

The Court took the matter under advisement and took post-hearing briefs. By the time all the briefing was submitted, the Court was left with a limited time to rule on setting aside the Second Cash Collateral Order, which was set to expire by its own terms at the end of February, 2013.    The Court was unable to provide a ruling in that time, and the Second Cash Collateral Order expired by its own terms.

As the Second Cash Collateral Order was set to expire, Debtor filed a Third Motion for Use of Cash Collateral.    Bridge Lenders again immediately objected.

Parties made the same arguments..   Debtor noted that the Court should provide for a

short continuation of the Second Cash Collateral Order because Debtor was on the

verge of filing a Plan of Reorganization.   Other creditors, and the United States

Trustee, offered commentary encouraging the Court to give Debtor a chance to at

least file a Plan. Such a filing, they suggested, would provide a very definitive

indication of whether this case had any chance of moving forward as a

reorganization.   The Court followed that suggestion, conditioning further approval

of cash collateral upon Debtor's filing of a Plan by the end of March, 2013.

Debtor filed its Plan at the end of March.   The Court entered an Order

extending cash collateral on April 5, 2013, through the time of hearing on Plan and

Disclosure Statement.   On April 12, 2013, the Court entered a Scheduling Order on

the Disclosure Statement and Amendment to the Plan.   It set the final confirmation

hearing on May 10, 2013.   After initial objections to Disclosure, the Court

combined the Disclosure hearing with Confirmation.   At the Bridge Lenders'

request, the Court continued the confirmation hearing to May 29, 2013 in Sioux

City, Iowa.   Bridge Lenders also filed an alternative Motion to Dismiss and/or

Relief from Stay to be held as part of the hearing.

At the May 29, 2013 Confirmation hearing, Debtor presented testimony to

support its Plan.   The Plan essentially changed the focus of Debtor's operation from

8

the corn germ and corn oil production facility to one focused on bringing Golden
Essence Flour to market.   Debtor provided substantial testimony about Golden
Essence Flour and the promise it held.   Virtually all the testimony came from those
employed or affiliated with Debtor's operations.   Debtor noted that all creditors,
other than the Bridge Lenders, had accepted the Plan.

The Bridge Lenders objected and provided substantial responding evidence.
The Bridge Lenders pointed out that Golden Essence Flour had been discussed since
the plant's opening in 2010.   They noted that they saw no promise in Golden
Essence Flour based on past experience.   They pointed out that Golden Essence
Flour has only recently made it to the shelves of stores—and only a few stores in
Iowa.   They also pointed out that Golden Essence Flour's total sales had only
amounted to a few thousand dollars.   The Bridge Lenders provided testimony about
the competition in the "gluten-free" market that Debtor intended to take a big piece
of with Golden Essence Flour.   The Bridge Lenders pointed out that Debtor had no
factual basis to support its projections that Golden Essence Flour would deliver the
enormous revenues Debtor projected.   Bridge Lenders noted that it was simply an
idea without substantial backing and noted this did not made the Plan feasible.

The Court now specifically finds that Debtor's testimony in favor of the Plan
was unpersuasive.   Debtor presented a very good idea, but no support from any

industry expert about the market opportunity, and in particular, the likelihood of

Golden Essence Flour capturing a significant share of the gluten-free market. Debtor

had no sales record of any consequence for the product.   Debtor had virtually no

marketing budget for Golden Essence Flour.   In short, the Court finds that the

Golden Essence Flour is a very appealing idea but one without sufficient backing in

the factual record to make it the basis for a feasible Plan of Reorganization of more

than $10,000,000 worth of debt.

The Court took the confirmation question under advisement by order of June

6, 2013.   The Court provided the parties an opportunity for post-hearing briefing.

A few weeks later, on June 19, 2013, David Hoffman, individually, filed the Motion

for Injunctive Relief.   He sought an injunction to prevent the Bridge Lenders from

collecting on personal guarantees related to the Bridge Lenders' loans.   He pointed

out that the Bridge Lenders were pursuing the personal guarantees from parties that

were intended to provide significant financing for Debtor's Plan of Reorganization.

The Bridge Lenders filed an objection to the Motion for Injunctive Relief and filed

their own Motion for Abstention in response on July 2, 2013.

Debtor filed a Joinder in the Motion for Injunctive Relief and an Objection to

the Motion for Abstention.   David Hoffman, individually, also filed an Objection to

the Motion for Abstention.   There were also a number of filings related to Objections to Claims.

The Court held the hearing on all these new motions July 9, 2013.   After substantial argument on these matters, the Court told the parties that instead of fighting through all of these new issues—that basically related to the Bridge Lenders' attempts to collect on the personal guarantees from the parties that were going to provide financing to the Plan—the Court would instead offer a tentative ruling to the parties on Plan Confirmation.   The Court informed the parties that it had tentatively determined that it would deny confirmation upon the finding that the Plan was too speculative to be feasible.   The Court noted that the Golden Essence Flour idea was a good one, but was not supported by any factual basis for the feasibility determination.   The Court then set a hearing on the Objections to the various Claims.

A few days after the Court provided its tentative ruling, Debtor and the Bridge Lenders, with the consent of other parties, called to inform the Court that they may have reached a global settlement.   They asked the Court to stop work on the Plan Confirmation Order that the Court noted it would provide after the tentative ruling. The Court agreed to do so.

After a substantial period of no additional filings or hearings, the Bridge

Lenders filed a renewed Motion for Relief from Stay on August 23, 2013.   At the

same time, David Hoffman individually filed a withdrawal of his Motion for

Injunctive Relief.   The Court set the hearing on the renewed Motion for Relief from

Stay on an expedited basis for September 17, 2013 at the Bridge Lenders' request.

The Court noted, at the time of hearing, that Debtor had not filed a resistance to the

Motion for Relief from Stay.   Debtor stated its belief that it had sufficiently

indicated its intent to resist the Motion in the scheduling hearing.   The Court went

ahead with the hearing.   Several breaks for Chamber's conferences and conferences

between the parties were interspersed throughout the hearing.   At the end of the

day, nothing of substance was resolved.

At the close of the hearing, the Court recapped the evidence as it saw it and

indicated (as is the Court's typical practice) how the evidence and arguments had

affected the stay issue before the Court.   The Court specifically noted that it had

given Debtor the benefit of the doubt in all prior proceedings.   The Court noted that

the Bridge Lenders had persuasively shown that not only was the Debtor's plant

continuing to lose value and dissipate the cash collateral as the Bridge Lenders had

predicted at the beginning of the case, the plant was now closed and no new income

was on the horizon.   The Court noted the lack of adequate protection offered to the

12

Bridge Lenders in this situation.    The Court noted that the Bridge Lenders had

shown that, even on Debtor's own numbers, the debts outweighed its assets.    The

Bridge Lenders, in particular, pointed out that even giveing the benefit of the doubt

to Debtor on all of the valuations—including the $8,000,000 valuation of the plant,

the $2,000,000 Debtor scheduled valuation of the feed mill, and taking the other

cash, vehicles, and equipment from the schedules and recent reports—Debtor at best

had total assets of $10,400,000.    The Bridge Lenders further pointed out that the

other debts, added to the $9,200,000 owed to the Bridge Lenders, provided a total

debt load of $10,800,000.

   The Court also noted that the Bridge Lenders had shown that there were

significant problems in Debtor's projections of how it would even keep the

non-operating plant at status quo.    The Bridge Lenders pointed out several

problems with the "winterization" of the plant, including whether the plant was

properly shut down.    The United States Trustee's Office pointed out the evidence

revealed that Debtor had made no provision in the projections for $50,000 in real

estate taxes that would be due or that Debtor could pay the substantial property

insurance premium due at the end of November.    The Bridge Lenders also correctly

pointed out that Debtor had failed to provide all the adequate protection and the

promised reports from the previous Cash Collateral Orders.    Based on all of this, the

13

Court noted it was having a difficult time finding a way to rule against the Bridge

Lenders again.   The Court invited Debtor's response.

Debtor argued that it was largely in this position because of the Court's

tentative ruling on its Plan of Reorganization.   Debtor reiterated it believed the Plan

was in fact feasible.   Nevertheless, Debtor noted at a minimum that the deadline for

financing the proposed global agreement was December 2, 2013, and it asked the

Court to give Debtor a chance to put something together by that time.   Debtor

acknowledged that the Court has been patient with Debtor, but noted that it was only

asking for a short amount of additional time.   Debtor also stated that it intended to

file a Motion for a Sale of the Plant under § 363, instead of letting it go to the State

court for foreclosure sale, which would result from the stay being lifted.   The Court

pointed out that Debtor had noted that on several occasions but it had yet to file it.

The Court noted that, however, that it would not rule immediately on this matter

because of its pressing schedule on other matters.   The Court informed Debtor that

it could file whatever it wanted to, including a Motion for § 363 Sale in the

meantime.   Debtor has filed nothing further.

## CONCLUSIONS OF LAW

## I.      CONFIRMATION OF THE PLAN—FEASIBILITY

As noted above, the Court provided a tentative ruling denying confirmation based on the Bridge Lenders' main argument that the Plan is not feasible under 11 U.S.C. § 1129(a)(11).   This Court has recently discussed feasibility requirement at length:

> In order to confirm a plan, the Court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Debtor or any successor to Debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This has come to be known as the "feasibility requirement." In re Monnier Bros., 755 F.2d 1336, 1340 (8th Cir. 1985). "[T]he bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." In re Gilbertson Rest. LLC, No. 04-00385, 2005 WL 783063, at *5 (Bankr. N.D. Iowa Apr. 4, 2005).

> This Court has more recently offered some additional detail on the standards it will apply when considering plan feasibility:
> To determine the feasibility of a plan, the court must ascertain the probability of actual performance of the provisions of the plan. In re Mosbrucker, 227 B.R. 434, 437 (B.A.P. 8th Cir. 1998), aff'd, 198 F.3d 250 (8th Cir. 1999). Feasibility of a Debtor's plan is a factual determination. Id.

>> This feasibility standard requires the Court to determine whether the plan offers a reasonable prospect of success and is workable. In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985). The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts. In re Clarkson, 767 F.2d 417, 420 (8th Cir. 1985).

>> The Eighth Circuit's feasibility test considers whether provisions in a plan are achievable given the unique facts

15

of the case.   In re Bowman, 253 B.R. 233, 238–39 (B.A.P. 8th Cir. 2000).   This Court will only approve a plan if it has a rational likelihood of success.   In re Danny Thomas Prop. II Ltd. P'ship, 241 F.3d 959, 963 (8th Cir. 2001).

In re Puff, No. 10-01877, 2012 WL 994007, at *5–6 (Bankr. N.D. Iowa Mar. 23, 2012) (citing In re Richards, No. 03-02487, 2004 WL 764526, at *2–3 (Bankr. N.D. Iowa Apr. 2, 2004)).   "This [feasibility] test is meant to **prevent** confirmation of plans based on **speculation**." Riverbend Leasing, 450 B.R. at 531–32 (emphasis added).

In re Civic Partners Sioux City, LLC, No. 11-00829, 2013 WL 5534743, at *15–16 (Bankr. N.D. Iowa Oct. 7, 2013).   As Chief Judge Shodeen pointed out in Riverbend Leasing, "the success of a debtor's proposed plan need not be guaranteed, but a bankruptcy court cannot approve a plan unless there is at least a reasonable likelihood of success."   Riverbend Leasing, 458 B.R. at 531 (quoted sources omitted) (internal quotation marks omitted).   Numerous courts in addition to Riverbend Leasing have cautioned against the use of speculative projections to support feasibility.   See In re Indianapolis Downs, LLC, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (noting "the purpose of the feasibility test is to protect against visionary or speculative plans");In re Las Vegas Monorail Co., 462 B.R. 795, 802 (Bankr. D. Nev. 2011) (cautioning the reliance on multiple speculative future events to establish feasibility).   Another court has stated it this way:   "A court should

16

consider 'concrete' and not 'speculative' projections of a business." <u>In re Geijsel</u>, 480 B.R. 238, 257–58 (Bankr. N.D. Tex. 2012).

In <u>Geijsel</u>, the court qualify its comments on citing speculative evidence a bit: "Still, as the court will be considering projections, some degree of speculation is involved. So, it is an overstatement to say that a debtor cannot speculate, but any speculation must be grounded in "financial realit[y]." <u>Id.</u> at 258 (quoted source omitted) (alteration in original).   Continuing to discuss this issue, the court noted: "One way to access the reliability and soundness of a debtor's projections is to use the period of the case as a test-run, and to see if the debtor has, indeed, been able to meet its projections." <u>Id.</u>   The court noted "If so, it alleviates much of the court's concerns." <u>Id.</u> (citing <u>In re Monnier Bros.</u>, 755 F.2d 1336, 1341–42 (8th Cir.1985) (it was a good sign of feasibility that debtors had been operating "within the bounds" of their projections); <u>see also</u> <u>In re Wolf</u>, 61 B.R. 1010, 1012 (Bankr. N.D. Iowa 1986) ("The feasibility of the debtor's projections is also corroborated by the debtor's performance during the proceedings in this court.").   The court noted "If debtors have not been meeting their projections, they need a legitimate, fixable excuse." <u>Id.</u>

The Court made somewhat similar observations in its recent decision in <u>Civic Partners</u>:

> Past performance is, however, a generally accepted factor to consider in determining the reliability of future projections.   <u>In re Am.</u>

17

Consol. Transp., 470 B.R. 478, 490 (Bankr. N.D. Ill. 2012).   As noted by Am. Consol. Transp., the Tenth Circuit B.A.P. has specifically stated:   "A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the Plan is not feasible."   Id. (quoting   F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Southwest, Inc.), 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006) (internal quotation marks omitted).

> However, as Am. Consol. Transp. also noted:
>
> > Yet a debtor's history is not the only factor to be considered. A Fifth Circuit Opinion has noted that "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible." Matter of T–H New Orleans Ltd. P'ship, 116 F.3d 790, 802 (5th Cir.1997).   Debtors are not required to view business and economic prospects in the worst possible light.   Id.

Id. at 491.   As another court put it:

> Fortunately for the improvement of the human condition (not to mention the rehabilitation of financially-troubled businesses), the past is not always prologue. On the other hand, both logic and experience teach that the past performance of a business venture, while it may not be an invariable predictor of future performance, is nevertheless—absent some dramatic change in economic conditions, debt structure, or business operations—powerful evidence as to a business's future viability or profitability. Certainly, it is the most objective evidence.

In re DeLuca, No. 95-11924-AM, 1996 WL 910908 (Bankr. E.D. Va. Apr. 12, 1996).

In re Civic Partners, 2013 WL 5534743, at *29–30.   The Court then continued:

> Applying these standards, the weight of the evidence at the
> confirmation hearing demonstrates the past is prologue here—and is a
> predictor of the future.   The projections offered are more conjectural,
> hopeful, and speculative than a credible path forward for Civic.

Id. at *30.

Applying all those standards here, the Court concludes that Debtor's Plan is
not feasible. It relies on a visionary and appealing idea, but is not supported by any
concrete factual evidence to meet feasibility standards.   It is instead based entirely
upon speculation about the success of Golden Essence Flour.   The Plan
dramatically changes course from the plant's prior operations.   Instead of focusing
on corn oil and corn germ meal, the plant would shift virtually its entire focus to
Golden Essence Flour.   It is undisputed, that Golden Essence Flour has had only a
few thousand dollars of total sales during the entirety of the plant's operation.   The
best evidence that Debtor could present is that Golden Essence is actually on the
shelves of a few Iowa grocery stores now.   There is no indication that it is selling at
any particular rate, and certainly no evidence that it is making a big impact on the
market. Debtor is left, at the end of the day, with a track record for Golden Essence
Flour that shows it is simply a good idea, but one that has not produced anything
tangible to date.

As the Court has noted, one of the biggest problems with Debtor's Plan and projections is the lack of testimony from anyone in the industry that Golden Essence Flour would fill a void or otherwise provide a crucial alternative to other gluten-free offerings.   Instead, Debtor simply suggests that the product is so good that it will definitely sell well and, if it sells well, it will be able to save the company.   This is simply speculation of the type insufficient to support confirmation of the Plan.

Debtor has suggested from the moment of filing the case that Golden Essence Flour would be a focal point for Debtor.   Yet, in the year and three months Debtor has been operating in bankruptcy, it has shown little or no success in bringing Golden Essence Flour successfully to market.   The Court again finds that the "past is prologue" here. In re Civic Partners, 2013 WL 5534743, at *30.

The following conclusion from Civic thus applies with even more force here: "The projections offered are more conjectural, hopeful, and speculative than a credible path forward."   Id. at *30.   Even giving Debtor all the benefits of doubt, at the end of the day, Debtor presents only a hopeful and conjectural view of what Golden Essence Flour could do to save the company, but offers wholly insufficient proof that this Plan has even a reasonable probability of success.   Thus, this Court denies confirmation on that basis.

**II.     Motion for Relief from Automatic Stay—Lack of Adequate
          Protection**

20

The Bridge Lenders have moved for relief from the automatic stay.   The

Bankruptcy Code provides:

> (d)  On request of a party in interest and after notice and a
> hearing, the court shall grant relief from the stay provided under
> subsection (a) of this section, such as by terminating, annulling,
> modifying, or conditioning such stay—

> (1) for cause, including the lack of adequate protection of
> adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d)(1) (2006).   The Bridge Lenders' Motion was based primarily, if

not entirely, on an argument of lack of adequate protection.   The Court finds and

concludes that the Motion for Relief from Stay is appropriate § 362(d)(1) for lack of

adequate protection.   As the 8th Circuit B.A.P. has noted:   "Creditors are entitled

to relief from the automatic stay if the debtor is not making mortgage payments, and

if there is insufficient equity in the property to adequately protect the creditor."

Martens v. Countrywide Home Loans (In re Marttens), 331 B.R. 395, 398 (B.A.P.

8th Cir. 2005).

That is essentially what is happening here.   Debtor has not made full

payment to Bridge Lenders under their secured mortgage obligation for the entirety

of the case.   This fact is undisputed.   Debtor is also been entirely unable to show

that there is not any equity in its property left to adequately protect the Bridge

Lenders.   The Bridge Lenders, on the other hand, have proved with little resistance

from Debtor that there is any equity that could provide adequate protection.   The

Bridge Lenders also point out that Debtor has offered no adequate protection in its

resistance other than to suggest that there is an equity cushion.   The Bridge Lenders

further point out that Debtor has been unable to even make the adequate protection

payments under the cash collateral orders in this case.   The Debtor has closed the

plant, has no incoming operating funds, and will not even be able to service its

minimal obligations over the next few months.

As proof of the latter power, the Bridge Lenders Point out that even Debtor's

proposed budget going forward fails to provide for the $50,000 tax payment (with a

$17,000 refund to Debtor), or to renew its property insurance with a significant

payment at the end of November.   The Bridge Lenders also argue Debtor's budget

has insufficient funds to further winterize the plant property.   They note that we are

moving into winter conditions, and Debtor simply does not have the funds

necessarily to prepare and maintain the plant for winter.   The United States Trustee

has largely supported Bridge Lenders' arguments in this regard.

Debtor has virtually no response on these points.   Debtor simply asks the

Court for more time and suggests that a further delay into the beginning of

December would not change matters significantly in any way.   The Court rejects

this argument.   As the Assistant United States Trustee pointed out, if the taxes go

22

unpaid, it is entirely possible that Debtor would open the property to a priming tax lien by the IRS and/or Iowa Department of Revenue.   Moreover, there would also likely be a lapse in insurance on the property, which is an unacceptable risk for all parties.

Nothing has been filed after the Stay hearing.   Debtor and other parties have several times suggested that a § 363 sale is more appropriate for this case.   Debtor, however, has not filed such a motion in spite of the Court's direction to do so if it wants the matter considered.   There is simply no § 363 sale motion or proposal before the Court.   Thus, it cannot be considered as a defense or even an alternative to the Motion for Relief from Stay.

### III.   Other Matters Pending Before the Court

The Court notes that there are technically still some matters that could be considered pending before the Court.   These include the Motion for Injunction filed by Mr. Hoffman which Debtor has joined.   While the Motion has been withdrawn, the Joinder by Debtor has not.   Also, the Bridge Lenders' Motion for Abstention on the same issues involved in the injunction is also pending.   The Court concludes that these issues are effectively rendered moot by the above ruling.   If the parties believe otherwise, they should file a motion asking the Court to amend or reconsider its ruling of mootness and/or its summary denial of the motions.

23

**IT IS ORDERED** that, for these reasons, the Court concludes that

confirmation of Debtor's Plan of Reorganization is DENIED.

**FURTHER**, the Court orders that Bridge Lenders' Motion for Relief from

Stay is GRANTED.

Dated and Entered:

October 28, 2013

_____

THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE